UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MICHIGAN CATHOLIC CONFERENCE,
et al.,

        Plaintiffs,

v.                                                                    Case No. 1:13-CV-1247

KATHLEEN SEBELIUS, et al.,                    HON. GORDON J. QUIST

        Defendants.

_____/

## **OPINION**

Plaintiffs, the Michigan Catholic Conference (MCC) and Catholic Family Services, d/b/a Catholic Charities Diocese of Kalamazoo (Catholic Charities), have sued Defendants, the Department of Health and Human Services and its Secretary, Kathleen Sebelius, the Department of Labor and its Secretary, Jacob J. Lew, and the Department of Treasury.  Plaintiffs seek to enjoin Defendants from enforcing provisions of the Patient Protection and Affordable Care Act (the ACA) related to contraceptive coverage.

This is one of many cases filed by religious nonprofits challenging the ACA's contraceptive coverage requirement.  As far as this Court is aware, ten courts have ruled on challenges to the final version of the regulations.  Six courts have ruled in favor of the plaintiffs.  *Southern Nazarene University, et al., v. Sebelius, et al.*, No. 5:13-cv-1015, 2013 WL 6804625 (W.D. Okl. Dec. 23, 2013); *Geneva College, et al. v. Sebelius, et al.*, 2:12-cv-00207 (W.D. Pa. Dec. 23, 2013); *Legatus, et al., v. Sebelius, et al.*, No. 12-1206, 2013 WL 6768607 (E.D. Mich. Dec. 20, 2013); *Reaching Souls, Int'l, Inc., et al. v. Sebelius, et al.*, No. CIV-13-1092-D, 2013 WL 6804259 (W.D. Okl. Dec.

20, 2013); *Roman Catholic Archdiocese of N.Y., et al. v. Sebelius, et al.*, No. 12civ2542, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013); *Zubik v. Sebelius*, No. 13cv1459, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013). Three courts have ruled in favor of the defendants. *Catholic Diocese of Nashville, et al. v. Sebelius, et al.*, No. 3:13-cv-1303 (M.D. Tenn. Dec. 26, 2013); *Univ. of Notre Dame v. Sebelius, et al.*, No. 3:13cv-01276-PPS-CAN (N.D. Ind. Dec. 20, 2013); *Priests for Life v. Sebelius, et al.*, No. 13-1261 (EGS), 2013 WL 6672400 (D.D.C. Dec. 19, 2013). And one court ruled in favor of the plaintiffs in part and the defendants in part. *Roman Catholic Archbishop of Washington v. Sebelius, et al.*, No. 1:13cv-01441-ABJ, 2013 WL 6729515 (D.D.C. Dec. 20, 2013).

Plaintiffs have moved for a preliminary injunction, requesting that the Court issue a decision before January 1, 2014. Defendants oppose the motion for preliminary injunction, and have moved to dismiss Plaintiffs' complaint. The Court has reviewed the parties' submissions and has held oral argument. Plaintiffs' motion for preliminary injunction is now ready for decision.

## Background

1.    The Plaintiffs

Plaintiff MCC is a nonprofit corporation that sponsors and administers the MCC Second Amended and Restated Group Health Benefit Plan for Employees (the MCC Plan). (Compl. ¶ 16.) The MCC Plan is a self-funded "church plan," and is administered by separate third party administrators (TPAs). (*Id.* ¶¶ 16, 41.) The MCC Plan provides health benefits to clergy, as well as to lay employees of Catholic schools, institutions, and other organizations (the covered units). (*Id.* ¶¶ 31, 41.) Catholic Charities, a nonprofit subsidiary of the Roman Catholic Diocese of Kalamazoo, is a covered unit under the MCC Plan. (*Id.* ¶¶ 17, 50.)

Plaintiffs believe that the use of contraceptives is immoral and that abortion and sterilization are prohibited. (Byrnes Decl. ¶¶ 8, 9.) In accordance with these beliefs, the MCC Plan has

historically not offered coverage for contraceptives, sterilization, abortion-inducing drugs, or related counseling services. (Long Decl. ¶ 17.) In the past, the MCC has specifically notified its TPA that it would not cover such services. (*Id.* ¶ 18.)

2.    The ACA Framework

The ACA, Pub. L. No. 111-148, 124 Stat. 119 (2012), was enacted in 2010. The ACA requires that employers with 50 or more full-time employees provide health insurance for their full-time employees or pay a penalty on their federal tax return. 26 U.S.C. § 4980H. Employers with fewer than 50 full-time employees are not required to provide their employees with health insurance. *Id.* If these employers offer health coverage to their employees, however, they are generally subject to the other requirements of the ACA. 42 U.S.C. § 300gg–13.

The ACA also requires that group health plans provide coverage for certain preventative services without cost-sharing requirements. These preventative services include "with respect to women, such additional preventative care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]. . . ." 42 U.S.C. § 300gg–13(a)(4).

Plans that are "grandfathered" under the ACA are not required to meet all the requirements for coverage, including that for women's preventative care services. 42 U.S.C. § 18011. A plan loses its "grandfathered" status if it cuts benefits or increases out-of-pocket spending for consumers. 26 C.F.R. § 54.9815-1251T. The government projects that the majority of plans will lose their "grandfathered" status by the end of 2013. *See* 75 Fed. Reg. 34552. The MCC plan is not a "grandfathered" plan under the ACA. (Compl. ¶ 43.)

3

3.    Rulemaking under the ACA

On February 15, 2012, the government published final rules pursuant to the ACA specifying that plans cover, among other things, "[a]ll [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity" (the contraceptive mandate). 77 Fed. Reg. 8725. The rule contained an exemption for certain religious employers. *Id.* at 8727. The goal of the exemption was to "respect[] the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. 46,621, 46,623. The rule provided a safe harbor for nonprofit organizations that had religious objections to contraceptive coverage but did not qualify for the exemption, and expressed the government's intention to develop new regulations to accommodate these organizations. 77 Fed. Reg. 8725, 8726-28.

On July 2, 2013, the government issued a final rule (the 2013 final rule) addressing the requirements for religious nonprofits and clarifying the religious employer exemption. 45 C.F.R. § 147.131(b). The rule establishes an accommodation (the accommodation) for organizations that meet the following criteria:

(1) The organization opposes providing coverage for some or all of the contraceptive services required to be covered under § 147.130 (a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record requirements under section 107 of [ERISA].

4

*Id.* The rule also clarified that the religious employer exemption applies to nonprofit organizations referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code, which refers to churches, their integrated auxiliaries, conventions and associations of churches, and the exclusively religious activities of any religious order. 45 C.F.R. § 147.131(a).

Under the 2013 final rule, an organization that meets the criteria for the accommodation is not required to "contract, arrange, pay, or refer for contraceptive coverage." 78 Fed. Reg. 39874. To avoid those obligations, the organization must submit a self-certification form to its health insurer or, if the organization has a self-insured plan, to a TPA. *Id.* at 39875. In the case of an organization with a self-insured plan, the TPA will provide or arrange for separate payments for contraceptive services for plan participants. *Id.* at 39880. The TPA will be reimbursed through adjustments to certain federal user fees. *Id.* The accommodation applies to plan years beginning on or after January 1, 2014. *Id.* at 39,872.

MCC qualifies for the exemption for religious employers. Catholic Charities does not qualify for the exemption, but does qualify for the accommodation. As such, Catholic Charities will have to self-certify in order to avoid being required to comply with the contraceptive mandate.

## Legal Standard

A preliminary injunction is an "extraordinary remedy" that is warranted only upon a clear showing that the movant is entitled to relief. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 376 (2008). A plaintiff seeking a preliminary injunction must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20, 129 S. Ct. at 374. "[I]n the First Amendment context, the other [preliminary

injunction] factors are essentially encompassed by the analysis of the movant's likelihood of success on the merits." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 890 (6th Cir. 2012).

## Discussion

1.  <u>Standing</u>

Under the ACA regulations, Defendants may enforce the contraceptive mandate against TPAs through ERISA's enforcement authority. *See* 78 Fed. Reg. at 39,879-39,880. However, church plans, including the MCC Plan, are specifically excluded from ERISA. *See* 29 U.S.C § 1003(b)(2). Defendants argue that, because they lack enforcement power over the TPA of the MCC Plan, there is no guarantee that the TPA will provide contraceptive coverage. Accordingly, Defendants argue, Plaintiffs lack standing because the harm alleged — the facilitation of access to contraceptive services — does not exist.

Defendants' argument is flawed. Regardless of whether the government can force the TPA to take any action, the 2013 final rule requires Catholic Charities to take some action — provide contraceptive coverage or self-certify. Plaintiffs object to taking either of these actions and allege that the act of self-certification, itself, violates their religious beliefs because it requires them to be involved in a "scheme" aimed at providing contraceptives. Whether the end result involves the provision of contraceptive services or not, Plaintiffs have alleged an injury-in-fact.

2.  <u>Likelihood of success on the merits</u>

Plaintiffs' claims arise under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.*, the First Amendment to the U.S. Constitution, and the Administrative Procedures Act (APA), 5 U.S.C. § 1001 *et seq*. The Court will address each of these claims in turn.

A.      RFRA

RFRA provides that the government shall not "substantially burden a person's exercise of religion," even under a "rule of general applicability," unless the government demonstrates "that application of the burden to the person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.[1]  A law substantially burdens an exercise of religion if it puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 718, 101 S. Ct. 1425, 1432 (1981).  "An inconsequential or *de minimis* burden on religious practice does not rise to this level, nor does a burden on activity unimportant to the adherent's religious scheme." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008).  The burden of demonstrating a substantial burden is high, and determining its existence is fact intensive.  *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007).

Plaintiffs argue that the contraceptive mandate imposes a substantial burden on their exercise of religion because it forces them to facilitate access to contraceptives and thus prevents them from bearing witness to their religious beliefs, causing "scandal."[2]  Plaintiffs argue that the accommodation does nothing to alleviate the burdens imposed upon them for several reasons. Plaintiffs state that the accommodation requires Catholic Charities to contract with a TPA which will

---

[1]The purpose of RFRA was to "restore the compelling interest test" abandoned by the Supreme Court in *Emp't Div. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595 (1990).  42 U.S.C. § 2000bb.  Thus, the Supreme Court's pre-*Smith* cases discussing the Free Exercise Clause are instructive in evaluating RFRA claims.

[2]The pleadings in this case do not define "scandal."  Testimony in *Zubik*, 2013 WL 6118696, was that, in the Roman Catholic faith, scandal "means cooperation with an objectionable practice that goes against the faith or teaching one thing and behaving in another manner."  *Id.* at *34, fn. 15 (internal quotations omitted).  This is consistent with the discussion of scandal during oral argument in this case.

provide contraceptive services to Catholic Charities' employees as long as they remain on the health plan.[3]  Catholic Charities must complete the self-certification form, which constitutes its "designation" of the TPA as the administrator for contraceptive benefits.  By these acts, Plaintiffs assert that they will be forced to participate in a "scheme *specifically designed to lure* women to engage in" the use of contraceptive services.  (Pls.' Br. Supp. Mot. for Prelim. Inj. (Pls.' Br.) at 22) (emphasis in original).[4]  In essence, Plaintiffs argue that the accommodation requires Catholic Charities to take actions that trigger its TPA to provide contraceptive coverage, which then provides a means for Plaintiffs' employees to access contraceptive services.  Thus, Plaintiffs argue, these acts constitute facilitation of objectionable services, and this facilitation is prohibited by their religious beliefs.

In response, Defendants point out that Catholic Charities may avoid the requirement to provide contraceptive coverage by self-certifying, i.e., signing a one-page form stating its objection to providing contraceptives, and submitting this form to its TPA.  Defendants argue that this is not materially different from actions that Plaintiffs have taken in the past when they informed their TPA that they objected to such services in order to exclude the services from the plan.   Because the regulation does not require Plaintiffs to "modify [their] behavior," *Thomas*, 450 U.S. at 718, 101 S. Ct. at 1432, Defendants argue that any burden is *de minimis*.  *See Kaemmerling*, 553 F.3d at 679.

The threshold issue before the Court concerns how to determine whether a burden is substantial.  The Tenth and Seventh Circuits, in cases brought by for-profit companies challenging

---

[3]At oral argument, Plaintiffs argued that the law would require them to seek out a TPA to provide contraceptive services.  It is undisputed that Plaintiffs already have a contractual relationship with a TPA.  (Compl. ¶ 41.)  Plaintiffs have not provided any evidence to indicate that their present TPA would refuse to provide these services.

[4]Plaintiffs also argue that the costs of providing contraceptive services will be passed back to religious organizations.  The law, however, expressly prohibits this.  78 Fed. Reg. at 39,875-77.  Any argument that TPAs will violate the law is speculative.

the contraceptive mandate, have focused solely on the extent of government pressure imposed by the law.  *See Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013).  The Tenth Circuit found that, once the court identified the religious belief and found that it was sincere, the only remaining question was whether the government exerted "substantial pressure on the religious believer."  *Hobby Lobby*, 723 F.3d at 1140.  Similarly, the Seventh Circuit found that the inquiry focused on the "coercive effect of the governmental pressure."  *Korte*, 735 F.3d at 684.  Under the approach advocated by Plaintiffs, if a plaintiff shows that it has a sincerely held belief that performing an act would violate its religious beliefs, the only remaining inquiry for the court is whether the government exerts substantial and coercive pressure on the plaintiff to perform the act.

Defendants argue that this misinterprets the substantial burden standard.  They assert that a plaintiff is entitled to its sincerely held beliefs but is not entitled to determine what constitutes a substantial burden on the exercise of these beliefs.  Although courts may not evaluate the merits of a plaintiff's beliefs, courts must examine the impact of a regulation on such beliefs.  This approach finds support in some district court opinions evaluating the contraceptive mandate as applied to for-profit corporations.  *Conestoga Wood Specialities Corp. v. Sebelius*, 917 F. Supp. 2d 394, 413 (E.D. Pa. 2013), *aff'd on other grounds*, 724 F.3d 377 (3d Cir. 2013) ("[W]e reject the notion . . .that a plaintiff shows a burden to be substantial simply by claiming it is so."); *Autocam Corp. v. Sebelius*, No. 1:12-CV-1096, 2012 WL 6845677, at *8 (W.D. Mich. Dec. 24, 2012) *aff'd on other grounds*, 730 F.3d 618 (6th Cir. 2013) (explaining that, although the court did not question the plaintiffs' sincerely held belief, it remained a "separate question whether the sincerely held belief amounts, in fact, to a substantial burden on the exercise of religion").

9

Defendants' argument is persuasive. RFRA requires heightened scrutiny of only those laws that place a "substantial" burden on an individual's exercise of religion. Thus, the Court "has a duty to assess whether the claimed burden — no matter how sincerely felt — really amounts to a substantial burden on a person's exercise of religion." *Autocam*, 2012 WL 6845677 at * 6. To make this assessment, the Court must necessarily evaluate how the burden affects an individual's ability to exercise his religion. "Without venturing into the content and merit of the plaintiffs' religious beliefs, [the Court] may still consider the nature of the act that the plaintiffs are called upon to perform, the connection between their beliefs and the compelled action, and the extent to which their ability to practice their religion is interfered with by the action." *Korte*, 735 F.3d at 710 (Rovner, J., dissenting).

In evaluating whether the burden is substantial, a court must determine whether it puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 718, 101 S. Ct. at 1432. The ACA and its regulation require Catholic Charities to sponsor a plan, to contract with a TPA for this plan, and to notify the TPA that it opposes contraceptive coverage on religious grounds. Plaintiffs have acknowledged that they already sponsor a plan, that they contract with a TPA to administer this plan, and that they have previously notified the TPA that they oppose contraceptives. Thus, they have no objection to these actions *per se*.[5] Plaintiffs argue, however, that the actions are now different because they will have the effect of authorizing the TPA to provide contraceptive services rather than preventing it from doing so, and that this difference is the key to determining the morality of their actions.

At oral argument, Plaintiffs made an analogy to a hypothetical law that required Roman Catholics to sign a document stating their opposition to the death penalty in order for an executioner

---

[5]Plaintiffs have never asserted that they object to the act of signing a statement attesting to their objection to contraceptives.

to proceed with the execution.  Under this hypothetical law, the executioner would be required to proceed as soon as he received the document.  Plaintiffs asserted that a Roman Catholic could not sign this document, even though it accurately stated his belief regarding the death penalty, because the document would effectively authorize the executioner to proceed with the execution.  Similarly, Plaintiffs argued that they could not sign the self-certification form stating their beliefs about contraceptives because it would trigger coverage of contraceptive services.

Plaintiffs' analogy does not hold up.  If the ACA provided that, upon the completion of the self-certification form, employees would be forced to use contraceptives, the analogy might be apt. But that is not what the ACA requires.

In sticking with the death penalty theme, a more apt analogy might involve a law that required potential jurors in capital cases to state whether they would be unable to impose the death penalty based on their religious beliefs.  If a potential juror said "yes," he would be excused for cause, and a different potential juror whose religion would not prohibit her from imposing the death penalty would be selected.  That jury, after hearing the evidence, might or might not choose to impose the death penalty.  Assume that there is a potential juror who is Roman Catholic and whose religion prohibits her from imposing the death penalty or facilitating the imposition of the death penalty.  Does asking her to state her opposition to the death penalty — which will eventually result in the selection of a jury that may choose to impose the death penalty — constitute a substantial burden?  This Court does not believe so.

Similarly, the accommodation in this case requires Catholic Charities to attest to its religious beliefs and step aside.  It is true that, once it steps aside, another person may step in and provide coverage of contraceptive services for Catholic Charities' employees.  These employees may then make a completely independent decision to utilize such services.  In any case, the action that

11

Plaintiffs' find objectionable — the use of contraceptives — is several steps removed from any action taken by Plaintiffs.  It is difficult to see how a substantial burden exists when the relationship to the objectionable act is so attenuated.  *See Conestoga*, 917 F. Supp. 2d at 414-15 (noting that a "series of events must first occur before the use of an abortifacient would come into play"); *Autocam*, 2012 WL 6845677 at *6 (finding that any burden imposed on the individual plaintiffs' free exercise rights was "probably too attenuated to be substantial").

More importantly, the contraceptive mandate requires Catholic Charities to do what it has always done —  sponsor a plan for its employees, contract with a TPA, and notify the TPA that it objects to providing contraceptive coverage.  Thus, Plaintiffs are not require to "modify [their] behavior."  *Thomas*, 450 U.S. at 718, 101 S. Ct. at 1432.  Rather, it is the TPA that is required to modify *its* behavior and take action by providing contraceptive services — without the assistance of Catholic Charities.  *See* 78 Fed. Reg. 39874. (eligible organizations may not be required to contract, arrange, pay, or refer for contraceptive coverage).  Although the TPA's action may be deeply offensive to the religious beliefs of Plaintiffs, RFRA does not allow a plaintiff to restrain the behavior of a third party that conflicts with the plaintiff's religious beliefs.

Courts have previously rejected RFRA claims in which plaintiffs objected to the activities undertaken by a third party.  *See Bowen v. Roy*, 476 U.S. 693, 106 S. Ct. 2147 (1986); *Kaemmerling*, 553 F.3d 669.  In *Kaemmerling*, the D.C. Circuit faced the issue of whether a prisoner could object to the government's collection, extraction, and storage of his DNA information.  The court found that, "[a]lthough the government's activities with his tissue or fluid sample after the [prison] takes it may offend Kaemmerling's religious beliefs, they cannot be said to hamper his religious exercise because they do not 'pressure [him] to modify his behavior and to violate his beliefs.'"  *Id.* at 679 (quoting *Thomas*, 450 U.S. at 718, 1015 S. Ct. at 1432.)  Similarly, in *Roy*, the Supreme Court

rejected the claim of the plaintiffs, who believed that the use of their child's social security number would harm her spirit. *Roy*, 476 U.S. 693, 106 S. Ct. 2147. The Court explained that the plaintiffs could "not demand that the Government join in their chosen religious preference by refraining from using a number to identify their daughter." *Id.* at 700, 106 S. Ct. at 2152.

Plaintiffs sincerely believe that the use of contraceptives is immoral, and that they may not facilitate a practice that they find morally objectionable. *See Thomas*, 450 U.S. at 714, 101 S. Ct. at 1430 ("courts are not arbiters of scriptural interpretation"). The Court must look beyond these beliefs, however, and determine whether the law at issue substantially burdens Plaintiffs' exercise of their religious beliefs. An objection to the activities of third parties — no matter how sincere or deeply felt — does not constitute a substantial burden. "[A]lthough [a] plaintiff may have a religiously-based objection to what the government or another third party does with something that the law requires the plaintiff to provide . . . [RFRA] does not necessarily permit him to impose a restraint upon another's decision." *Korte*, 735 F.3d at 713-14 (Rovner, J., dissenting).

Moreover, although Plaintiffs assert that the accommodation requires them to participate in a scheme to provide contraceptives, in fact, it just does the opposite. It provides a mechanism for employers with religious objections to contraceptives, like Catholic Charities, to opt out of that scheme. This mechanism simply requires Plaintiffs to state that they choose to opt out based on their religious beliefs. The fact that the scheme will continue to operate without them may offend Plaintiffs' religious beliefs, but it does not substantially burden the exercise of those beliefs.

Plaintiffs may exercise their religious beliefs regarding contraceptives in a number of ways. They may refuse to provide coverage of contraceptives or pay for such coverage. They may speak out against the use of contraceptives, and encourage their employees not to use contraceptives. They may engage in political action to change the laws regarding access to contraceptives and

13

contraceptive coverage.  What they may not do, however, is block a third party from providing their employees with contraceptive coverage.  Under these circumstances, the Court finds that the law does not place a substantial burden on Plaintiffs' exercise of their religion.  Accordingly, their RFRA claim fails.

      B.    Free Exercise Clause

The Free Exercise Clause prohibits laws that discriminate against religious beliefs or regulate or prohibit conduct because it is undertaken for religious purposes.  *Church of Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S. Ct. 2217, 2226 (1993).  The Free Exercise Clause does not require heightened scrutiny of laws that are neutral and generally applicable.  *Emp't Div. v. Smith*, 494 U.S. 872, 879, 110 S. Ct. 1595, 1600 (1990).  "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral."  *Lukumi*, 508 U.S. at 533, 113 S. Ct. at 2227.  A law is not generally applicable if its burdens are imposed "in a selective manner . . . only on conduct motivated by religious belief."  *Id.* at 543, 113 S. Ct. at 2232.

Plaintiffs argue that the contraceptive mandate is not generally applicable because it includes exemptions.  However, "[t]hat categorical exemptions exist does not mean that the law does not apply generally."  *Autocam*, 2012 WL 6845677 at * 5 (citing *United States v. Lee*, 455 U.S. 252, 260-61, 102 S. Ct. 1051, 1057 (1982) (finding that social security tax requirements were generally applicable although there were categorical exemptions)).  *See also Olsen v. Muaksey*, 541 F.3d 827, 832 (8th Cir. 2008) ("General applicability does not mean absolute universality.").  Because the "secular" exemptions cited by Plaintiffs apply to all employers, including religious employers, the burdens of the law are not imposed selectively against conduct motivated by religious belief.  *See Lukumi*, 508 U.S. at 533, 113 S. Ct. at 2227.  Accordingly, the law is generally applicable.

Plaintiffs also argue that the law is not neutral because it "is specifically targeted at Plaintiffs' religious practice of refusing to provide or facilitate access to contraception." (Pls.' Br. at 34.) Plaintiffs argue that most secular employers previously provided coverage, and that the law was enacted to fill any gap in coverage by forcing religious groups to provide it. There is no evidence, however, that the law was specifically targeted at the Plaintiffs' or anyone else's religious practices. In fact, the inclusion of an exemption for houses of worship and an accommodation for other religious groups indicates just the opposite. Furthermore, the contraceptive mandate requires many employers that have historically provided contraceptive coverage to expand that coverage by eliminating cost-sharing. The contraceptive mandate thus requires a wide range of employers — including many that are not religious— to offer their employees new benefits related to contraceptive coverage. Accordingly, there is no evidence supporting Plaintiffs' claim that the law is not neutral.

Finally, Plaintiffs argue that the contraceptive mandate is subject to strict scrutiny because it infringes on Plaintiffs' rights of free speech and association, and thus implicates Plaintiffs' "hybrid" rights. Because the Sixth Circuit has rejected the hybrid rights theory advanced by Plaintiffs, *Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177, 180 (6th Cir. 1993), this argument must fail.

C.      Free Speech Clause

Plaintiffs argue that the contraceptive mandate violates their free speech rights in several ways. Plaintiffs first argue that the regulations violate their rights against compelled speech. "It is . . . a basic First Amendment principle that freedom of speech prohibits the government telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, – U.S. – , 133 S. Ct. 2321, 2327 (2013) (internal quotation marks omitted); *see also United States v. United*

15

*Foods, Inc.*, 533 U.S. 405, 410, 121 S. Ct. 2334, 2338 (2001). Similarly, the government may not compel a person to subsidize speech with which he or she disagrees. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557–58, 125 S. Ct. 2055, 2060–61 (2005). Plaintiffs argue that the contraceptive mandate violates the prohibition against compelled speech in two respects. First, they argue that because it requires them to "provide, pay for, and/or facilitate access to 'counseling,'" (Pls.' Br. at 36), they are being forced or compelled to support speech with which they disagree. Plaintiffs argue that they are thus "forced to act as mouthpieces in the Government's campaign to expand access to abortion and contraception." (*Id.* at 37.) Second, Plaintiffs assert that the "certification" requirement, which in turn designates and obligates Plaintiffs' TPA to provide the objectionable services, compels Plaintiffs to engage in speech with which they disagree and deprives them of the freedom to speak on issues of abortion and contraception on their own terms.

Contrary to Plaintiffs' assertion, the contraceptive mandate does not require or compel them to support or advocate for abortion or the use of contraceptives. As already noted, *supra*, Plaintiffs are not required to provide or pay for contraceptive services. Moreover, even if Plaintiffs' acts are deemed as facilitating the provision of contraceptive services, including counseling, there is no compelled speech violation because Plaintiffs are not required to support or advocate a particular viewpoint or result. *See Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 441 (W.D. Pa. 2013) ("To the extent that the Hepler plaintiffs in the present case are being called upon to fund speech—in the form of education and counseling—the content of that speech is not defined by the mandate's requirements."). As one court has observed, "the speech subsidized is an unscripted conversation between a doctor and a patient, not political propaganda in favor of one candidate, an amicus brief espousing one side of an issue, or advertisements in favor of a particular product." *O'Brien v. United States Dep't of Health & Human Servs.*, 894 F. Supp. 2d 1149, 1166 (E.D. Mo. 2012).

Hence, the regulations do not compel Plaintiffs to convey any particular message or speech in violation of the First Amendment.

Plaintiffs' argument that the certification constitutes compelled speech fails because any speech involved in the execution of a certification is appropriately considered merely incidental to the regulation of conduct. As many courts have recognized in disposing of similar First Amendment challenges, *Rumsfeld v. Forum for Academic and Inst. Rights, Inc.* (*FAIR*), 547 U.S. 47, 126 S. Ct. 1297 (2006), is particularly instructive as to whether the certification constitutes speech. In *FAIR*, the Court considered whether the Solomon Amendment, which conditioned law schools' funding on their provision of access to military recruiters at a level equal to that provided to the nonmilitary recruiter receiving the most favorable access, violated law schools' First Amendment rights. The Court held that requiring law schools to accommodate military recruiters on campus did not affect their free speech rights because hosting a recruiter is not speech:

> In this case, accommodating the military's message does not affect the law schools' speech, because the schools are not speaking when they host interviews and recruiting receptions. Unlike a parade organizer's choice of parade contingents, a law school's decision to allow recruiters on campus is not inherently expressive. Law schools facilitate recruiting to assist their students in obtaining jobs. A law school's recruiting services lack the expressive quality of a parade, a newsletter, or the editorial page of a newspaper; its accommodation of a military recruiter's message is not compelled speech because the accommodation does not sufficiently interfere with any message of the school.

*Id.* at 64, 126 S. Ct. at 1309–10. Moreover, the Court observed that any speech in which the law schools were required to engage was "plainly incidental to the Solomon Amendment's regulation of conduct." *Id.* at 62, 126 S. Ct. at 1308; *see also United States v. O'Brien*, 391 U.S. 367, 376, 88 S. Ct. 1673, 1678 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). Similarly, in the instant case, any speech in which Plaintiffs must engage in completing the

certification is incidental to regulation of conduct.  *See e.g.*, *Autocam*, 2012 WL 6845677, at *8 ("Including contraceptive coverage in a health care plan is not inherently expressive conduct, particularly when the coverage is included to comply with a neutral, generally applicable law."); *MK Chambers Co. v. Dep't of Health & Human Servs.*, No. 13-11379, 2013 WL 1340719, at *6 (E.D. Mich. Apr. 3, 2013) (same).  Accordingly, the act of self-certifying eligibility for the accommodation is not inherently expressive conduct entitled to First Amendment protection.

Finally, Plaintiffs argue that 26 C.F.R. § 54.9815-2713A(b)(iii) constitutes an unlawful "gag order" on their freedom to express their beliefs that contraception is immoral.  That regulation provides:

> The eligible organization must not, directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements.

Plaintiffs argue that this regulation precludes them from expressing their views to fellow citizens that contraception is immoral.  (Pls.' Br. at 38.)  The Court disagrees.  The regulation does not prohibit Plaintiffs from expressing their views.  Rather, it precludes Plaintiffs from interfering with a TPA's decision or efforts to provide contraceptive services once Plaintiffs have provided a certification.  In other words, Plaintiffs may still convey their views about contraception, but they may not do so in a way that threatens or interferes with employees' attempts to obtain coverage from a third party.  *See* 78 Fed. Reg. at 39,880 n.41 ("Nothing in these final regulations prohibit an eligible organization from expressing its opposition to the use of contraceptives.").

D.    Establishment Clause

Plaintiffs argue that the religious employer exemption violates the Establishment Clause of the First Amendment.  That clause provides that "Congress shall make no law respecting an

establishment of religion." U.S. Const. amend. I. Under this clause, the government may neither officially promote religion nor harbor "an official purpose to disapprove of a particular religion or of religion in general." *Lukumi*, 508 U.S. at 532, 113 S. Ct. at 2226. Courts typically use the *Lemon* test [*Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105 (1971)] as a guide to resolve Establishment Clause issues. *See Satawa v. Macomb Cnty. Road Comm'n*, 689 F.3d 506, 526 (6th Cir. 2012). Under that test, a court asks: (1) whether the government's predominant purpose was secular; (2) whether the government action has the purpose or effect of endorsing religion; and (3) whether the action fosters an excessive entanglement with religion. *Id.*

Plaintiffs argue that the mandate favors some religions over others by creating an official category of "religious employer" that includes only "churches, synagogues, mosques, and other houses of worship, and religious orders." 78 Fed. Reg. at 8,461. Plaintiffs argue that such definition favors religious groups that fit into the traditional categories of "houses of worship" while disadvantaging other religious organizations, like Catholic Charities, that express their faith through the provision of charitable and social services. Plaintiffs' argument fails because the regulation does not refer to any particular denomination, nor is there any indication that it was designed to favor any particular religion. *See Cutter v. Wilkinson*, 544 U.S. 709, 723–24, 125 S. Ct. 2113, 2123 (2005) (holding that the Religious Land Use and Institutionalized Persons Act does not run afoul of the Establishment Clause because it does not "differentiate among bona fide faiths" and "confers no privileged status on any particular religious sect, and singles out no bona fide faith for disadvantageous treatment"). As several courts have observed, the Establishment Clause does not prohibit governmental line drawing when granting religious accommodations. *See O'Brien*, 894 F. Supp. 2d at 1164. "[T]he Establishment Clause does not prohibit the government from making such distinctions when granting religious accommodations as long as the distinction drawn by the

19

regulations between exempt and non-exempt entities is not based on religious affiliation." *Grote Indus., LLC v. Sebelius*, 914 F. Supp.2d 943, 953 (S.D. Ind. 2012) (citing *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 90 S. Ct. 1409 (1970), and *Droz v. Comm'r of IRS*, 48 F.3d 1120, 1124 (9th Cir. 1995)); *see also Geneva Coll.*, 929 F. Supp. 2d at 438 (concluding that the religious employer exemption does not make distinctions that violate the Establishment Clause).

Plaintiffs also argue that the exemption fosters excessive entanglement because the IRS applies an "intrusive" 14-factor test to determine whether an organization is a church. Plaintiffs argue that any application of the 14-factor test will constitute improper scrutiny of whether an organization is sufficiently religious to qualify for the exemption. Plaintiffs' argument lacks merit because there is no indication that the 14-factor test has ever been applied to them. *See United States v. Will*, 671 F.2d 963, 967 (6th Cir. 1982) (noting that a guideline contained in an IRS internal manual was "adopted solely for the internal administration of the IRS, rather than for the protection of the taxpayer, [and did] not confer any rights upon the taxpayer"). Moreover, as Defendants note, the requirements for an organization to qualify as a "religious employer" are set forth in the pertinent regulation, 45 C.F.R. § 147.131(a), and require no intrusive inquiry by the government to determine whether an organization qualifies as a "religious employer."

Citing *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, – U.S. – , 132 S. Ct. 694 (2012), Plaintiffs also argue that the mandate interferes with the internal governance of the Catholic Church by artificially splitting the church into two segments and precluding the church from exercising supervisory authority over its subordinate components to ensure compliance with church teachings. This Court agrees with Justices Alito's and Kagan's concurrence that the "ministerial" exception in employment law "should apply to any 'employee' who leads a religious organization, . . . or *serves as a messenger or teacher of its faith*." *Id.* at 712 (Alito, J., concurring)

(emphasis added).  The principle of no governmental interference with the religious functions of a church goes beyond the employment context.  In the instant case, this Court believes that Catholic Charities would qualify as messengers or teachers of the Roman Catholic faith.  For example, while any secular organization might render aid to the sick, poor, or oppressed, a Roman Catholic organization would render such aid as part of its religious duty and message.  As pointed out in this concurring opinion, "the mere adjudication of such questions [e.g., whether a particular doctrine "is a central and universally known tenet of Lutheranism"], would pose grave problems for religious autonomy . . . ."  *Id.* at 715.  All of that being said, *Hosanna-Tabor* is inapposite.  In *Hosana-Tabor*, the Court adopted the so-called "minister exception" to employment discrimination suits.  The Court reasoned that requiring a church to retain an unwanted minister would do more than intrude on an employment decision.  *Id.* at 706.  Rather, it would "interfere[] with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs."  *Id.*  The regulations at issue in the instant case do not interfere with internal church governance.  Rather, for the reasons stated in the "substantial burden analysis," they relieve the Plaintiffs from a law that would otherwise cause them to violate their religious beliefs.

E.    APA

Plaintiffs argue that the 2013 final rule discriminates against them based on their refusal to provide coverage for "abortion-inducing products."   Plaintiffs argue that the rule therefore violates the Weldon Amendment, which prohibits federal agencies from discriminating against any health care entity on the basis that it does not provide coverage for abortions.  Thus, Plaintiffs argue, the rule is contrary to law.

Plaintiffs believe that FDA-approved emergency contraceptives are "abortion-inducing products" — as is their right.  However, federal law does not define them as such.  *See* 62 Fed. Reg. 8610.  Accordingly, the regulations are not contrary to law, and Plaintiffs' APA claim fails.

3.      Other Preliminary Injunction Factors

Because Plaintiffs' claims are premised on the First Amendment and RFRA, the analysis of Plaintiffs' likelihood of success encompasses the other factors for determining whether a preliminary injunction is warranted.  *See Autocam Corp. v. Sebelius*, 730 F.3d 618, 624 (noting that the likelihood of success is often the determinative factor for RFRA and First Amendment claims). Because Plaintiffs have not demonstrated that they are likely to succeed on the merits, the Court need not analyze the other factors.

**Conclusion**

For the foregoing reasons, the Court will deny Plaintiffs' motion for preliminary injunction. An Order consistent with this Opinion will be entered.


Dated:  December 27, 2013                        /s/ Gordon J. Quist
                                              GORDON J. QUIST
                                              UNITED STATES DISTRICT JUDGE